Argued at Pendleton May 6; reversed July 8; argued and submitted on rehearing October 27, 1931; former opinion adhered to January 5, 1932

## FIRST BANK OF JUNTURA *v.* SITZ ET AL.

(1 P. (2d) 126, 6 P. (2d) 242)

*J. W. Biggs,* of Burns, for appellants.

*Robert M. Duncan,* of Burns, for respondent.

RAND, J. On May 21, 1919, the defendant, J. L. Sitz, contracted to sell and one Ralph Chambers to buy for a stipulated price of $59,870 the lands and livestock belonging to Sitz. The contract, as shown by the evi-

dence, was partly in writing and partly oral. It was agreed that, upon the execution of the contract, Chambers should have the immediate possession of the property; that Sitz should at once execute and place in escrow a deed of conveyance of the land and a bill of sale transferring the personal property; that Chambers should execute promissory notes to bear interest at six per cent per annum from date for the entire purchase price and a mortgage upon the land and personal property securing the payment of the four notes last falling due under the contract, aggregating $40,000, and give notes not secured for the balance of the purchase price, and that all said papers should be placed in escrow with a designated bank at Burns and held in escrow until the unsecured notes had been fully paid, when the deed and bill of sale were to be delivered to Chambers and the mortgage to Sitz. Pursuant thereto, Chambers took possesion of the property, Sitz executed the deed and bill of sale and Chambers executed seven promissory notes and a mortgage securing the payment of the last four, and all said papers were placed in escrow in said bank. Of said promissory notes not secured, one was for the sum of $7,870, payable December 1, 1919; one for $6,000, payable December 1, 1920; and one for $6,000, payable December 1, 1921. Of the notes secured by the mortgage, one was for $10,000, payable December 1, 1922; one for $10,000, payable December 1, 1923; one for $10,000 payable December 1, 1924; and one for $10,000, payable December 1, 1925.

Chambers was unable to pay said notes, or any of them, and on March 29, 1920, the note which had fallen due on December 1, 1919, not having been paid, Sitz, in writing, extended the time of payment of the principal of each of said notes for the period of one year from

and after the date when each matured. Thereafter, Chambers made default not only by failing to pay the notes then due but also by failing to pay a part of the interest that had then accrued. While so in default, Chambers was indebted to the First Bank of Juntura, plaintiff herein, for moneys borrowed for the recovery of which plaintiff, in November, 1923, brought action against Chambers and in said action caused the hay that had been raised and harvested upon the Sitz lands to be attached. Later in the action plaintiff obtained judgment against Chambers and an order for the sale of the attached hay. While that action was pending, the contract between Sitz and Chambers was rescinded by mutual consent and possession of the property mentioned in the contract was delivered to Sitz, who thereupon demanded of the sheriff the surrender of the attached hay. Upon the refusal of the sheriff to surrender the possession thereof, Sitz executed and delivered to the sheriff a redelivery bond with the other defendants herein as sureties. The attached hay was then delivered to Sitz and was fed by him during the ensuing winter to the livestock mentioned in the contract. The sheriff died and said redelivery or forthcoming bond was lost. This is a suit in equity brought by the plaintiff to have the lost instrument restored and to enforce it by a decree and judgment against Sitz and his sureties for the value of the attached hay which the complaint alleges consisted of 384 tons and was of the value of $8 per ton.

The court gave a decree in favor of plaintiff for $2,688 with interest and costs, and found that the hay, at the time of its delivery to Sitz, was of the value of $7 per ton.

There is no dispute in the testimony except upon one point. Defendant Sitz testified that Chambers in

July, 1923, some four months before the commencement of the attachment action, offered to surrender possession to him of all the property covered by the contract and that at that time the contract between them was mutually rescinded and that thereafter Chambers was an employee of Sitz during the time the hay was cut and harvested. This testimony was disputed by Chambers. He testified that the contract was not rescinded until November, 1923, and that he was in possession under the contract of the lands and livestock at the time the hay was harvested and the attachment was made. If the testimony of the defendant Sitz is to be believed, then the hay was cut and harvested by Chambers as an employee of Sitz and, of course, Chambers could have had no interest in the attached hay, while, if Chambers' testimony is true, then the hay was cut and harvested pursuant to the terms of the contract and the rights and obligations of the parties must be determined by the provisions of the contract under which Chambers was acting at the time the hay was harvested. For the purposes of this discussion, we shall assume that Chambers' testimony is true and that the contract was not rescinded until after the attachment had been made.

■ The question then presents itself: Did Chambers have an attachable interest in the hay? And this is the only question necessary for decision upon this appeal.

Plaintiff relies upon *Sievers v. Brown,* 34 Or. 454 (56 P. 171, 45 L. R. A. 642), to support its right to recover in this suit. In that case the defendant had given plaintiff a bond for a deed to lands on which plaintiff had raised a crop of wheat, oats, vegetables and hay and defendant had appropriated the crop to his own use.

The action was for conversion. Plaintiff recovered for the hay but failed to recover for the wheat, oats and vegetables for the reason that he had not shown that those crops were planted or sowed before his tenancy had terminated. Plaintiff alone appealed and, of course, his right to recover for the hay was not questioned or passed upon. Hence, all that the court said in that case related to emblements only and had no application to a crop of hay spontaneously growing from perennial roots such as the hay crop involved here. In this case, the crop, not having been sown annually, was fructus naturales as distinguished from fructus industriales. In 17 C. J., P. 380, footnote 17a, the authors say: "The fruit of trees, perennial bushes, and grasses growing from perennial roots are fructus naturales." Numerous decisions are cited in support thereof.

The written contract on its face shows that it was not a contract which could have been completely performed by the purchase of the lands or livestock separately. It was an entire contract and could not be completely performed except by the payment of the entire consideration. It was definite in amount and in terms and the evidence shows that it involved the sale and purchase of some seven or eight hundred head of livestock as well as of the land on which the hay was grown. Without the use of the hay grown annually on this land for feeding purposes, the livestock could not exist during the winter months of any ordinary year. Of this fact the parties were aware at the time they entered into the contract and in the absence of any agreement that the hay, when harvested, should be the property of the vendee, it is clear that Chambers could have no interest in the hay apart from his contract and that the only rights he could acquire in the hay was the

right, so long as he performed the contract upon his part, to have possession of the hay for the sole purpose of feeding it to the livestock. No one could successfully contend that, under this contract, Chambers could harvest the hay and then sell it without the assent of Sitz and refuse to feed the stock which he had contracted to buy. In discussing the law applicable to this case, Mr. Williston says:

"* * * The creditors of the vendor it is true cannot by seizing the property destroy the purchaser's interest, as creditors of one who has contracted to sell ordinary chattel property may do, but this only shows what must certainly be fully admitted, that equity treats the purchaser (unless a purchaser for value without notice has acquired the title) as having an interest in the property. It does not show the extent of that interest. On the other hand, it is to be observed that creditors of the vendee cannot generally seize his interest except by a bill in equity; it is not subject to execution unless the price has been paid": 2 Williston on Contracts, § 936, p. 1777; *Ledbetter v. Anderson,* Phillips, Eq. (62 N. C.) 323, 1 Ames Cas. Eq. Jur. 214.

There is another applicable principle of law which we think is also decisive of this case. Under the decisions of this court as well as those in many other jurisdictions, it has been held that a vendee, under a contract for the purchase and sale of lands, so long as he complies with his contract, acquires an equitable interest in the subject of the contract which a court of equity will protect against acts done by the vendor in violation of the contract and that the vendor will be held to be a trustee for the vendee under such contract. This doctrine was announced in *Lyons v. Chaffee,* 79 Or. 485 (154 P. 688), and in the numerous cases there cited. It is also the doctrine announced in *Sievers v. Brown,* supra. Under this doctrine Chambers could

acquire only an equitable interest in the subject-matter of the contract until he had completely performed his contract and paid the purchase price. His interest, therefore, in the land and the livestock and in the hay grown upon the land was only an equitable interest and as such it was not an attachable interest. It could not be seized under attachment or execution. It is only such rights and interests as are legal in their nature that are attachable in this state under the former decisions of this court: *Oregon Railway and Navigation Co. v. Gates,* 10 Or. 514.

■ It is clear, therefore, that Chambers had no property right in the hay which could be attached by one of his creditors at the time the attachment was made and that the attempted attachment of the hay at the suit of plaintiff bank was void *ab initio* and, hence, there was no consideration for the giving of the redelivery or forthcoming bond. Therefore, this action cannot be maintained. The decree appealed from will be reversed and the cause remanded with directions to dismiss the complaint, and it is so ordered.

ROSSMAN and KELLY, JJ., absent.

304

Argued and submitted on rehearing October 27; former opinion
adhered to January 5, 1932.

On Rehearing
(6 P.(2d) 242)

RAND, J. Upon the reargument of this cause, it was again insisted that, since it is a well-established rule of law that the title to harvested crops follows the actual possession and not the right to possession, the court erred in holding that Chambers, the vendee, under a contract for the purchase of a large number of cattle and horses as well as the land on which the hay had been harvested and stacked, had no attachable interest in the hay.

■ As we attempted to point out in our former opinion, Chambers had been let into possession under a contract for the sale of the live stock and of the land and had obligated himself to cut and stack the hay and feed the same to the live stock. In fact, the very existence of the live stock depended upon the use of the hay for feeding purposes during the coming winter. Chambers had never made any substantial payment under his contract. He was in default practically for the entire amount of the principal and interest, a large part of which was then due and unpaid.

There was a dispute in the testimony whether, at the time the hay was cut and stacked, the contract had been rescinded and, if so, whether Chambers was a mere employee or was still acting under the contract. If Chambers was acting as an employee while engaged in putting up the hay, he could have no interest in it, while if the contract had not been rescinded, he was in default and it could be terminated any time by the vendor. In order to dispose of the case, we gave Chambers the benefit of the doubt and assumed that at the time the hay was stacked he was not acting as an

employee but under the contract and held that, upon that theory, he had no interest in the hay which he could make the subject of sale or which could be attached by one of his creditors. As we viewed the case then and now, the hay was as much the subject of the contract as was the live stock and the land itself. As was said by Lord Chelmsford in *Shaw v. Foster*, L. R. 5 H. L. 321, copying from the note in 3 Pomeroy, Eq. Jurisp. (3d Ed.), to section 1260:

"According to the well-known rule in equity, when the contract for sale was signed by the parties, Sir W. Foster (the vendor) became a trustee of the estate for Pooley (the vendee), and Pooley a trustee of the purchase-money for Sir W. Foster."

Lord Cairns said (p. 338):

"Under these circumstances, I apprehend there cannot be the slightest doubt of the relation subsisting in the eye of a court of equity between the vendor and the purchaser. The vendor was a trustee of this property for the purchaser; the purchaser was the real beneficial owner, in the eye of a court of equity, of the property, subject only to this observation, that the vendor, whom I have called the trustee, was not a mere dormant trustee,—he was a trustee having a personal and substantial interest in the property, a right to protect that interest, and an active right to assert that interest if anything should be done in derogation of it. The relation, therefore, of trustee and cestui que trust subsided, but subsided subject to the paramount right of the vendor and trustee to protect his own interest as a vendor of the property."

Quoting further from the note:

"That interest, Sir George Jessel says, in a subsequent case, is synonymous with the ordinary term, the 'vendor's lien' or charge. Lord O'Hagan said (p. 349): 'By the contract of sale the vendor, in the view of the court of equity, disposes of his right over the

estate, and on the execution of the contract he becomes constructively a trustee for the vendee, who is thereupon, on the other side, bound by a trust for the payment of the purchase-money'.''

Hence, under this view, whatever interest Chambers may have had in the hay it was subject, like the cattle and the land, to the charge of the vendor for. the unpaid purchase money and it being a mere equitable interest, it was not subject to attachment. Again, under the contract, even if Chambers had not been in default, he was bound to feed the hay to the cattle or provide other hay in lieu of it. Hence, under either view, he had no ownership of the hay except for the purpose of performing his contract and he had no interest in it which was subject to attachment by one of his creditors.

As we view the case now, the doctrine of emblements has no application and the case of *Seivers v. Brown*, 34 Or. 454 (56 P. 171, 45 L. R. A. 642), was upon an entirely different state of facts and is not in point. All that was said in our former opinion about emblements was said because that was the principal point relied upon by the parties in their arguments upon the first hearing.

For these reasons and for those formerly stated, our former opinion will be adhered to.

ROSSMAN and CAMPBELL, JJ., absent.